# EXHIBIT
# "B"

DocuSign Envelope ID: FAAD3C2F-4809-4403-A99D-3CE984E4B9AC

*Execution Version*

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is entered into on July 1, 2024 (the "Commencement Date") by and between DARIUS MOURA ("Employee") and BEACON SALES ACQUISITION, INC., a Delaware corporation (the "Company").

## RECITALS

A. Pursuant to that certain Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), by and among (a) the Company, (b) Extreme Metal Fabricators, LLC, a Florida limited liability company ("Seller"), and (c) Paul Filipe, as the sole member of Seller (the "Owner"), the Company is acquiring substantially all of the assets of the Seller. Prior to the closing of the transaction contemplated by the Purchase Agreement, Employee has been an employee of Seller for approximately twelve (12) years. Upon closing of the transaction contemplated by the Purchase Agreement, Employee will become an employee of the Company pursuant to this Agreement. This Agreement is being entered into in connection with the closing of that transaction and will only become effective upon such closing occurring.

B. The Company and its Affiliates are engaged in the Building Products Distribution Business (as defined below).

C. Employee has knowledge of trade secrets and other non-public confidential business information and business relationships that, following the consummation of the transactions contemplated by the Purchase Agreement, will be proprietary to the Company, highly sensitive, and constitute valuable assets being acquired by the Company, together with the goodwill of the Purchased Business (as defined below), pursuant to the Purchase Agreement and the instruments executed and delivered in connection therewith.

D. Employee, during Employee's employment with the Company, will become acquainted with trade secrets and other non-public confidential business information and business relationships that the Company and its Affiliates have developed, acquired and use and which are commercially valuable to the Company and which the Company desires to protect, and Employee may contribute to such information through inventions, discoveries, improvements or otherwise.

E. In order to protect the Company's trade secrets, confidential business information, business relationships, goodwill, and investment that the Company makes in its employees, the Company desires to bind Employee to certain restrictive covenants, and Employee agrees to be so bound, on the terms and conditions set forth herein.

## AGREEMENTS

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Employment Period. Employee's employment shall commence on the Commencement Date and, subject to Section 5(a), continue until the third (3rd) anniversary of the Commencement Date (the "Employment Period"). The Employment Period may be terminated prior to the expiration by either party in accordance with the provisions of Section 5 below.

2. Employment Duties and Compliance with Company Group Policies. During the Employment Period, Employee shall serve as a Branch Manager of the Company with the duties, responsibilities, functions, and authority that are normally associated with such position and shall report to such person (the "Supervising Officer") as shall be designated by the Company's applicable Regional Vice President or such other person as shall be further designated by the Supervising Officer. Employee shall perform such services and assume such duties and responsibilities as may from time to time be reasonably assigned to him by the Supervising Officer. Employee shall perform such duties and responsibilities at the Company's Palm City, Florida branch (the "Job Location"), subject to reasonable travel requirements. Employee shall serve the Company faithfully, diligently and competently and to the best of his ability, and Employee shall use his full business efforts to further enhance and develop the Company's business affairs, interests and welfare. Except for during periods of illnesses, vacation and reasonable leaves of absence, Employee shall devote his full business time and attention to the business and affairs of the Company and the performance of his duties hereunder. The foregoing notwithstanding, Employee may, subject to the Company Group Policies (defined below), engage in charitable, civic, fraternal and trade association activities that do not interfere materially with Employee's obligations to the Company or any Affiliate. At all times during employment with the Company, Employee shall (a) fully comply with and follow all of the Company's and the Company Group's then existing written employment policies and practices, the Beacon Code of Ethics & Business Conduct, as amended (the "Code of Ethics") and each of the other policies, practices and codes of conduct then applicable to employees of the Company, including amendments, supplements or newly implemented policies and practices, (collectively, the "Company Group Policies") and (b) execute certifications and acknowledgements that confirm that Employee is aware of and agrees to comply with the Code of Ethics and each of the other Company Group Policies.

3. Compensation and Benefits. In exchange for services rendered by the Employee hereunder, the Company shall provide the following:

(a) Salary. During the Employment Period, the Company shall pay to Employee a salary ("Salary") for all services rendered by Employee under this Agreement of One Hundred Eighty-Five Thousand Dollars ($185,000.00) per year, less tax and other required withholdings. The Salary shall be paid on a regular basis in accordance with the Company's then normal payroll procedures and policies, but no less than monthly, and shall be prorated for any partial fiscal years. The Salary may not be decreased during the Employment Period.

(b) Signing and Retention Bonus. Upon the Commencement Date, Employee will be entitled to a signing bonus of Twenty-Five Thousand Dollars ($25,000) (the "Signing Bonus"), less tax and other required withholdings. In the event that Employee is still employed by the Company on the first anniversary of the Commencement Date, then Employee will be entitled to a retention bonus of Twenty-Five Thousand Dollars ($25,000) (the "Retention Bonus"), less tax and other required withholdings. The Retention Bonus will be paid on the first regular payroll date following the first anniversary of the Commencement Date. In the event Employee's employment is terminated prior to the first anniversary of the Commencement Date due to death, Disability or termination by the Company without Cause, the Retention Bonus will be paid to Employee or his estate within thirty (30) days following the termination date. In the event Employee's employment is terminated prior to the first anniversary of the Commencement Date other than for death,

Disability or termination by the Company without Cause, Employee will not be entitled to the Retention Bonus.

(c) Annual Incentive Plan and Other Compensation. Employee shall be eligible to participate in a bonus plan based on financial and individual goals set by the Supervising Officer (the "Annual Bonus"), with a target bonus payment of twenty percent (20%) of Salary, less tax and other required withholdings. The performance period for the Annual Bonus is the Company's fiscal year, and (subject to satisfaction of the applicable performance criteria as determined by the Company in the ordinary course of business in its sole discretion) Employee will be eligible to receive a pro-rated Annual Bonus for the 2024 fiscal year, with such pro-ration being determined by the duration of Employee's employment by the Company during the 2024 fiscal year.

(d) Long-Term Incentive Plan. Beginning in fiscal year 2025, Employee will be eligible to participate in the Company's Long-Term Incentive Plan ("LTI Plan"). For the fiscal year ended 2025 performance year, Employee's Annual LTI Target Award Value (as defined under the LTI Plan) will be Eleven Thousand Dollars ($11,000) with all award values, award types, vesting schedules, and any other award terms and conditions to be in accordance with the LTI Plan and subject to review and approval by the Compensation Committee of the Board of Directors of the Company in its sole discretion.

(e) Benefits. Employee shall be entitled during the Employment Period to participate in such employee benefit plans and programs, including life and disability insurance and medical, dental and 401(k) plans, as are maintained from time to time for salaried employees of the Company, to the extent that his position, tenure, compensation, age, health and other qualifications make him (and his dependents) eligible to participate. Notwithstanding anything to the contrary herein contained, (i) the Company does not promise the continuance of any particular plan or program during the Employment Period, (ii) Employee's (and his dependents') participation in any such plan or program shall be subject to the provisions, rules, regulations and laws applicable thereto and (iii) such plans or programs may be amended or terminated at any time by the Board of Directors of the Company in its sole discretion.

(f) Business Expenses. The Company shall reimburse Employee for all reasonable business expenses incurred by Employee in the course of performing Employee's duties and responsibilities under this Agreement, which business expenses are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses. In addition, the Company shall provide Employee with a monthly vehicle stipend of Six Hundred Dollars and No/100 ($600.00) related to the business use of the Employee's personal vehicle.

4. Assignment of Inventions. Employee hereby assigns and agrees to assign to the Company, its successors, assigns or nominees, all of Employee's copyrights and rights to inventions, trademarks, trade names and patents that, during the Employment Period, Employee makes or conceives, either solely or jointly with others, in the course of such employment or with the use of the Company's time, material or facilities, or relating to any subject matter with which Employee's work for the Company was, is or may be concerned. Employee further agrees promptly to disclose to the Company such copyrightable materials and inventions and without further charge to the Company, but at its expense, to execute, acknowledge and deliver all such

further papers, including applications for copyrights and patents, as may be necessary to obtain copyrights and patents for said materials or inventions in any and all countries and to vest title thereto in the Company, its successors, assigns and nominees. If Employee fails or refuses to sign documents necessary to secure or enforce the Company's rights, or if the Company is unable for any other reason to secure Employee's signature on any document for this purpose, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney in fact, to sign such documents and do all other lawfully permitted acts in connection with the foregoing. Employee has been notified by the Company, and understands, that the foregoing provisions of Section 4 do not apply to an invention for which no equipment, supplies, facilities or trade secret information of the Company or any of its Affiliates is used and which is developed entirely on Employee's own time, unless: (a) the invention relates (i) to the business of the Company or any of its Affiliates or (ii) to the Company's or any of its Affiliates' actual or demonstrably anticipated research and development, or (b) the invention results from any work performed by Employee for the Company or any of its Affiliates. The obligations of Employee contained in this Section 4 shall survive the discontinuance or termination of this Agreement for any reason.

5. Severance; Termination.

(a) Subject to the provisions set forth below, Employee's employment may be terminated (i) by Employee voluntarily at any time, or (ii) by the Company at any time, with or without Cause by providing notice to the Employee. The Company's obligations under Section 3 shall cease upon termination of employment. No such termination, however, shall relieve the Company of the obligation to pay the Salary or reimbursable business expenses owed to the Employee for services performed and business expenses owed to the Employee through the date of termination.

(b) Subject to the conditions set forth in this Section 5(b), if, prior to the end of the Employment Period, Employee's employment is terminated by the Company other than for Cause, the Company (i) will provide Employee with severance payments (the "Severance Payments") in the amount of Salary for a six (6) month period (the "Severance Period") following the termination of employment; and (ii) Employee also shall be permitted, at Employee's election, to continue to participate in the Company's Health, Dental and Vision Plans in accordance with COBRA, and the Company shall subsidize Employee's continued coverage in effect as of the date of termination such that the Employee's contribution remains the same as it was as of the date of termination for a period ending on the earlier of (A) the expiration of the Severance Period, and (B) the date Employee becomes eligible for such coverage from a subsequent employer. Employee agrees that if he elects to continue coverage in accordance with COBRA, the Company may deduct Employee's contribution from the Severance Payments. The Severance Payments shall be paid in accordance with the Company's customary payroll practices over the Severance Period. Notwithstanding the foregoing, the Company shall not be obligated to pay the Severance Payments or COBRA payment (1) at any time that Employee is in breach of any provision of this Agreement and does not cure such breach (if capable of being cured) within ten (10) days after Employee's receipt of written notice from the Company specifying the breach, (2) unless Employee executes and delivers to the Company (and does not revoke) within thirty (30) days following Employee's termination of employment an effective general release (in form and substance reasonably satisfactory to the Company) whereby Employee releases the Company Group, and the respective

directors, officers, employees, agents, representatives and shareholders of the members of the Company Group, from all claims Employee may have from or arising out of this Agreement or otherwise from his employment with the Company that can be released or waived under applicable law, except for the Company's obligations under this Section 5(b), or (3) if any time during which the Severance Payments are to be made Employee applies for or seeks any state, federal or other benefits arising from his separation from employment. Notwithstanding the foregoing, and without limiting any other provision of this Agreement, the Company shall not be obligated to make the Severance Payments (or any other severance payment) or COBRA (i) payment following Employee's death, except Company shall pay the Employee's Estate any Salary or reimbursable expenses which accrued prior to the Employee's death, or (ii) if Employee's employment is terminated for Cause or by Employee's Disability or resignation. The conditions and obligations within this Section 5(b) are material to, and not intended by the parties to be severable from, one another.

(c) Upon any termination of Employee's employment, Employee shall immediately return to the Company all Company Group documents and data, in whatever form, including any and all Confidential Information and other properties of the Company Group which are in Employee's possession, custody or control.

(d) Concurrent with termination of Employee's employment with the Company for any reason, Employee shall resign from all positions with the Company Group.

6. Restrictive Covenants.

(a) Non-Competition/Non-Solicitation. In further consideration of the compensation to be paid to Employee hereunder, Employee acknowledges that during the course of Employee's employment with the Company and Affiliates he has and shall become familiar with the Company's and its Affiliates' corporate strategy, pricing, and other market and financial information, know-how, trade secrets, and valuable customer, supplier, and employee relationships, and with other Confidential Information concerning the Company and its Affiliates, and that Employee's services have been and shall be of special, unique, and extraordinary value to the Company and its Subsidiaries and Affiliates. Accordingly, during the Restricted Period, Employee shall not directly or indirectly (i) engage in the Building Products Distribution Business anywhere in the Territory other than on the Company Group's behalf, (ii) Solicit any Customer to purchase from any person other than the Company Group any service or product sold by the Company Group at any time from the Commencement Date through the end of the Restricted Period, (iii) Solicit any Customer to cease doing business with any member of the Company Group or alter or limit its business relationship with any member of the Company Group, or (iv) on behalf of any person other than the Company Group, hire or Solicit the employment (or Solicit to retain the services) of any Business Associate. Nothing in this Agreement shall prevent Employee from owning less than two percent (2%) of any class of publicly-traded securities so long as such investment is passive and Employee has no other involvement with the issuer of such securities. To "engage" in the Building Products Distribution Business in the Territory means (x) to render services of, or sell or distribute products of, the Building Products Distribution Business in (or with respect to) the Territory, or (y) to own, manage, operate or control (or participate in the ownership, management, operation or control of) an enterprise engaged in the Building Products Distribution Business in the Territory. Notwithstanding the foregoing, upon the Employee's termination with the Company, the Employee may own equity or act as an employee, officer,

DocuSign Envelope ID: FAAD3C2F-4809-4403-A99D-3CE984E4B9AC

director, independent contractor, consultant, advisor, and/or agent for Metal Alliance Holdings, LLC, and/or its subsidiaries ("Metal Alliance").

(b) Confidentiality. Subject to Section 10(a) below, Employee agrees that, during the Restricted Period: (i) Employee shall (and shall cause Employee's Affiliates to) maintain all Confidential Information in strict confidence, (ii) Employee shall not (and shall cause Employee's Affiliates not to), directly or indirectly, disclose any Confidential Information to anyone outside of the Company Group; and (iii) Employee shall not (and shall cause Employee's Affiliates not to), directly or indirectly, use any Confidential Information for his own benefit or the benefit of any person other than a member of the Company Group. Nothing in this Agreement, however, shall prohibit: (A) Employee from disclosing any Confidential Information (or taking any other action) in furtherance of Employee's duties to the Company Group while employed by the Company; or (B) any person from using or disclosing Confidential Information to the extent required by law. If Employee is required by law to disclose any Confidential Information, then Employee shall (1) provide the Company with prompt notice before such disclosure in order that the Company may attempt to obtain a protective order or other assurance that confidential treatment will be accorded such information and (2) cooperate with the Company in attempting to obtain such order or assurance. Upon the Company's request at any time, Employee must immediately deliver to the Company all tangible items in Employee's possession or control that are or that contain Confidential Information, without keeping any copies. "Confidential Information" means information regarding the Purchased Business, the Building Products Distribution Business or the Company Group that has not been disclosed by duly authorized agents of Seller and the Purchased Business prior to the Commencement Date or the Company Group to the public and is not known to the general public, and which shall include, but not be limited to, the following with respect to the Purchased Business, the Building Products Distribution Business or the Company Group: (i) information regarding operations, assets, liabilities or financial condition; (ii) information regarding bidding, quotations, price, sales, merchandising, marketing and promotions (including marketing strategies and concepts), advertising campaigns, capital expenditures, costs, joint ventures, business alliances, products, services or purchasing; (iii) information regarding the terms, conditions and employment relationship the Seller and the Purchased Business have with employees, including, non-public information regarding their monetary compensation, benefits and employee personnel files; (iv) information regarding the terms, conditions and relationship the Seller and the Purchased Business have with Business Associates (other than employees), including their identities, responsibilities, qualifications, benefits, compensation and files; (v) customer lists, databases and other information related to current or prospective customers, including information regarding their identities, contact persons and purchasing patterns; (vi) information regarding current or prospective vendors, suppliers, distributors or other business partners; (vii) forecasts, projections, budgets and business plans; (viii) information regarding the planned or pending acquisitions, divestitures or other business combinations; (ix) technical information, models, know-how, protocols, discoveries, techniques, processes, business methods, trade secrets and proprietary information; and (x) contemplated website designs, website content, domain names, data bases, internet hyperlinks, internet banners and internet search engine listings. "Confidential Information" shall not include information that (i) is publicly known through no wrongful act or breach of obligation of confidentiality, (ii) was rightfully received by Employee from a third party without a breach of any obligation of confidentiality by such third party, or (iii) arises from Employee's general training, knowledge, skill, or experience.

(c) Non-Disparagement. Subject to Section 10(a) below, Employee shall not, directly or indirectly, make (or cause to be made) to any person any disparaging, derogatory or other negative or false statement about the Company Group, the Purchased Business or any of their respective Affiliates (including any of their products, services, policies, practices, operations, employees, sales representatives, agents, officers, members, managers, partners or directors). Company shall not, directly or indirectly, make (or cause to be made) to any Person any disparaging, derogatory or other negative or false statement about the Employee; provided, provided, however, notwithstanding the foregoing, Company shall not be responsible for any disparaging, derogatory or other negative or false statement about Employee by: (i) former employees, officers, directors, or board members of the Company or any other entity in the Company Group; or (ii) current employees of the Company who are not executive officers, directors or board members of the Company or any other entity in the Company Group. Nothing in this Section 6(c) is intended to or shall prevent, impede or interfere with the parties providing truthful testimony and information in the course of an investigation or proceeding authorized by law and conducted by a governmental agency.

(d) Non-Endorsement. During the Restricted Period, Employee shall not, directly or indirectly, make (or cause to be made) to any person any endorsement or other commercially supportive statement about any person engaged in whole or in part in the Building Products Distribution Business (including any endorsement or other commercially supportive statement about such person's products, services, equipment, suppliers, policies, practices, operations, employees, sales representatives, independent contractors, licensees, advisors, agents, officers, directors, shareholders, members, managers, partners, Subsidiaries or other Affiliates).

(e) Divestiture of Interests; Resignation. Contemporaneous with the Commencement Date, Employee will (i) divest any equity ownership interest, membership interest, stockholder interest, shareholder interest, profits interest, or any other economic or ownership interest whatsoever in (1) Metal Alliance, (2) any Affiliate of Metal Alliance or (3) any Affiliate of Paul Filipe, (ii) resign as an employee, officer, and manager of Metal Alliance and (iii) resign as an employee, officer, member, manager, consultant, independent contractor or any other position or relationship similar to the foregoing of (a) any Affiliate of Metal Alliance or (b) any Affiliate of Paul Filipe. Any interests contemplated by this Section 6(e)(i) have been accurately disclosed to Company in writing.

(f) Scope of Covenants. Employee hereby acknowledges and agrees that the foregoing covenants and the territorial, time and activity limitations set forth herein are commercially reasonable and are properly required to protect the Company, the Company Group, and their Affiliates and respective businesses. If any such territorial, time or activity limitation is determined to be unreasonable by a court or other tribunal, the parties agree to the modification and/or reduction of such territorial, time or activity limitations (including the imposition of such a limitation if it is missing) to such an area, period or scope of activity as said court or tribunal shall deem reasonable under the circumstances. Also, if the Company seeks partial enforcement of Sections 6(a), (b), (c), (d) or (e) as to a lesser territory, time or scope of activity, then the Company shall be entitled to such reasonable partial enforcement. If such reduction or (if the Company seeks partial enforcement) such partial enforcement is not possible, then the unenforceable provision or portion thereof shall be severed as provided in Section 10(b).

7. Representation and Warranties of Employee. Employee represents and warrants to the Company as follows:

(a) he has received representation from independent counsel prior to entering into this Agreement; and

(b) he is not under any contractual restriction or other restriction or obligations that are inconsistent with the execution of this Agreement, performance of his duties and covenants hereunder, or the rights of the Company pursuant to this Agreement.

8. Notices. Any notice provided for in this Agreement must be in writing and must be either personally delivered, or sent by confirmed email (provided, however, that notices delivered by email shall be effective only if such notice is also delivered by hand, or mailed by first class mail (postage prepaid and return receipt requested) or sent by reputable overnight courier (charges prepaid), on or before two (2) business days after its delivery by email) or by reputable overnight courier service (charges prepaid) to the recipient at the address indicated below:

To the Company:

c/o Beacon Roofing Supply, Inc.
505 Huntmar Park Drive, Suite 300
Herndon, VA 20170
Attention: Christine Reddy
Email: christine.reddy@becn.com

To Employee:

Darius Moura
4800 Christensen Road
Fort Pierce, Florida 34981
Email: dariusmoura@gmail.com

and/or such other address and/or to the attention of such other person as the recipient party shall have designated by notice given in accordance with this Section 8. Any notice under this Agreement shall be deemed to have been given: (b) if delivered in person, at the time delivered; (c) if sent by email, at the time sent; or (d) if sent by overnight courier, one business day after being given to the courier.

9. Definitions. For purposes of this Agreement, the following definitions shall apply:

(a) "Affiliate" shall mean, any employer with which the Company would be considered a single employer under Section 414(b) or 414(c) of the Code (as defined below), applied using fifty percent (50%) as the percentage of ownership required under such Code sections, including (i) any Person (as defined below), any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with, such specified Person and (ii) any Person that is a natural Person, the spouse, ancestors, or lineal descendants of such Person, any limited partnership or limited liability company controlled by such Person or such Person's spouse, ancestors, or lineal descendants or in which such Person or such Person's spouse, ancestors, or

lineal descendants hold a majority interest, any trust established for the benefit of any of them and such Person's estate or legal representative.

(b) "Building Products Distribution Business" means the business of the sale and distribution of products and the provision of services in the fields of (A) residential and commercial roofing, including but not limited to shingles (all types including but not limited to asphalt, wood, and synthetic), built-up, modified, EPDM, TPO/PVC and low-slope commercial; (B) siding, (C) windows, (D) skylights, (E) doors, (F) decking and railings, (G) waterproofing products and materials, including sealants, fillers, coatings and adhesives marketed to the waterproofing industry, (H) fiberglass, cellulose, spray foam, mineral wool and other insulation products, (I) asphalt, (J) roof coatings and adhesives specially designed for and marketed to the roofing contractor industry, (K) metal roofing, (L) plywood, (M) millwork, (N) synthetic stone, (O) lumber, (P) moldings, (Q) barriers and barrier systems including firestopping systems and devices, (R) drainage materials, (S) gutters and gutter coils, and (T) tools, equipment and other accessories used in (A) through (S) above.

(c) "Business Associate" means any employee, contractor, subcontractor, representative, consultant or agent of the Company or the Company Group or any of their respective Subsidiaries who has acted in such capacity at any time within the twelve (12) months immediately preceding the date of hire, recruitment, solicitation, or retention of such person.

(d) "Cause" means (A) Employee's gross negligence or willful misconduct in the performance of Employee's duties, (B) any act of fraud or embezzlement by Employee against the Company Group, other wrongful taking by Employee of money or other assets of the Company Group for Employee's personal use, self-dealing by Employee directly or indirectly involving the Company Group, or Employee's conviction for (or plea of nolo contendere or the like with respect to) any felony or any lesser crime involving moral turpitude that reasonably would be expected to materially damage the Company Group from a financial or reputational perspective; (C) Employee's dissemination of Confidential Information in violation of Section 6(b) and/or Employee's breach of the restrictive covenants in Section 6 (excluding any unintentional and de minimis violations that are promptly cured); (D) any material breach of the terms of this Agreement that is not cured (if capable of being cured) within thirty (30) days of Employee's receipt of written notice of such breach; (E) Employee's failure to follow the reasonable directives of the Company's Chief Executive Officer or the Supervising Officer, which failure is not cured within thirty (30) days of Employee's receipt of written notice of such failure; and/or (F) conduct that constitutes a violation of any law or Company Group Policies, including respecting employment discrimination or harassment.

(e) "Code" shall mean the Internal Revenue Code of 1986, as amended.

(f) "Company Group" means, collectively, the Company, its Subsidiaries and other Affiliates.

(g) "Control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities or equity interests, by contract or otherwise.

DocuSign Envelope ID: FAAD3C2F-4809-4403-A99D-3CE984E4B9AC

(h) "Customer" means any person who purchased any product or service from the Company Group or the Purchased Business at any time during the term of this Agreement or at any time during the twelve (12) months immediately preceding the Commencement Date, with whom Employee was either involved (directly or indirectly) or about which Employee received Confidential Information.

(i) "Disability" means Employee is suffering from any illness, injury or other disability which has caused Employee to be unable to perform any of Employee's essential duties with the Company, with or without reasonable accommodation, for ninety (90) consecutive days or for one hundred twenty (120) cumulative days during any one hundred eighty (180) day period or Employee is receiving long term disability benefits under any policy, plan or program.

(j) As used herein, "including", "include" and words of like import shall be construed broadly as if followed by the words "without limitation" or "but not limited to".

(k) "Person" shall be construed broadly to include any individuals or any entity (including any trustee, corporation, partnership, limited liability company, trust estate, joint venture, bank, government entity or other organization, association or entity).

(l) "Purchased Business" means the business conducted by the Seller as a manufacturer and supplier of metal panel roofing systems and custom sheet metal fabrications for commercial, residential, agricultural and industrial applications, which includes fabricating, supplying and/or transporting metal roofing panels and trims and structural components, as well as related metal roofing fasteners, accessories, tools and other products.

(m) "Restricted Period" means the period from the Commencement Date until twelve (12) months immediately following the termination of Employee's employment for any reason and regardless of whether such termination occurs during the Employment Period or at some point following the expiration of this Agreement; except that if a court or arbitrator finds that a twelve (12) month Restricted Period is not reasonably necessary to protect legitimate business interests of the Company, the Restricted Period shall be the period from the Commencement Date until nine (9) months immediately following the termination of Employee's employment for any reason; except that if a court or arbitrator finds that a nine (9) month Restricted Period is not reasonably necessary to protect legitimate business interests of the Company, the Restricted Period shall be the period from the Commencement Date until six (6) months immediately following the termination of Employee's employment for any reason.

(n) "Solicit" means to encourage or induce, or to take any action that is intended or calculated to encourage or induce, which has the effect of encouraging or inducing, or which is reasonably likely to result in encouragement or inducement.

(o) "Subsidiary" shall mean, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture, or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person (or, in the case of a partnership, limited liability company, or other similar entity, control of the general

partnership, managing member, or similar interests) or Persons (whether directors, managers, trustees, or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

(p) "Territory" means the State of Florida.

10. General Provisions.

(b) No Interference; Defend Trade Secrets Act. Notwithstanding any other provision of this Agreement, nothing in this Agreement shall prohibit Employee from confidentially or otherwise communicating or filing a charge or complaint with a federal, state, local or other governmental agency or regulatory (including self-regulatory) entity; participating in a governmental agency or regulatory entity investigation or proceeding; giving truthful testimony or statements or disclosures to a governmental agency or regulatory entity, or if properly subpoenaed or otherwise required to do so under applicable law; disclosing the factual foundation of any claim of sexual harassment or sexual assault; disclosing any alleged discriminatory or unfair employment practice; or exercising any legally protected whistleblower rights (including pursuant to Section 21F of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder), without notice to or consent from the Company. Furthermore, the U.S. Defend Trade Secrets Act of 2016 provides that: (a) an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (b) an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal, and (B) does not disclose the trade secret, except pursuant to court order. Nothing in this Agreement prohibits or creates liability for any such protected conduct.

(c) Severability. Except as otherwise set forth in Section 6(b), whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction so as to best give effect to the intent of the parties under this Agreement. Without limitation of the foregoing: (i) any one or more of Sections 4, 6(a), 6(b), 6(c) or 6(d) may be so severed from the remainder of this Agreement; and (ii) the periods set forth in Section 6 shall be construed as if each month therein were listed in a separate clause which may be so severed. If Employee is determined to have breached any of the covenants contained in Section 6, the time period provided for with respect to that covenant shall be tolled (i.e., shall not run) as to Employee for so long as he is in breach thereof.

(d) Remedies. If Employee breaches any of the provisions of this Agreement (including the provisions of Section 4, Section 6 or Section 7), then the Company shall be entitled to seek, in addition to any other remedies that it may have, specific injunctive or other equitable relief (without the requirement of posting a bond or other security), in order to enforce such provision. Employee agrees that any violation of Section 4 or Section 6 would cause immediate and irreparable harm to the Company Group for which full damages cannot readily be calculated and for which damages are an inadequate remedy. Employee further agrees to reimburse the Company for all costs and expenditures, including but not limited to reasonable attorneys' fees and court costs, incurred by any of them in connection with the successful enforcement of any of their rights under Section 4 and Section 6 herein.

(e) Entire Agreement. This Agreement represents the entire understanding and agreement of the parties hereto with respect to the subject matter hereof, supersedes all prior negotiations between such parties, and preempts any prior understandings, agreements or representations by or between Employee and the Company, written or oral, which may have related to the subject matter hereof in any way.

(f) Counterparts; Electronic Signatures. This Agreement may be executed and delivered in separate counterparts, each of which shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement. Execution and delivery of this Agreement by electronic exchange bearing the copies of a party's signature shall constitute a valid and binding execution and delivery of this Agreement by such party. Such electronic copies shall constitute enforceable original documents.

(g) Successors and Assigns. Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by Employee, the Company Group and their respective heirs, legal representatives, successors and assigns. This Agreement is not assignable by the Employee. The Company may unilaterally assign its rights and obligations under this Agreement to any Affiliate, or to any successor to the Company's rights and obligations hereunder as a result of any change in control, merger, consolidation, restructuring or reorganization or to any other successor to all or substantially all of the securities, business and/or assets of the Company or any of its Affiliates, and Employee shall continue to be bound by the terms and conditions of this Agreement. In connection with any such assignment by Company, following such assignment, references to "Company" in this Agreement, shall mean, as applicable, the assigned Affiliate or the successor to all or substantially all of the securities, business and/or assets of Company or any of its Affiliates to whom this Agreement is assigned.

(h) Waiver. The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

(i) Headings. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

(j) Amendments. This Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the parties hereto.

(k) Survival. Sections 4 and 6 through 10 shall survive the termination of Employee's employment and shall continue in full force in accordance with their terms notwithstanding the termination of the Employment Period and this Agreement.

(l) Governing Law. This Agreement shall be governed by the internal laws of the State of Florida, without regard to its conflict of laws rules.

(m) Fees. In any action to enforce the terms of this Agreement or arising out of this Agreement, the prevailing party shall be entitled to recover its fees and costs, including reasonable attorneys' fees.

(n) Other Obligations. Employee's obligations under this Agreement (including Section 6 hereof), are in addition to, and without limitation of, Employee's obligations under any other agreement (including the Purchase Agreement) or applicable law.

(o) Section 409A. This Agreement is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and shall be interpreted and construed consistently with such intent. All references in this Agreement to Employee's termination of employment shall mean his separation from service within the meaning of Section 409A of the Code. Payments provided herein are intended to be exempt from Section 409A of the Code to the maximum extent possible, under either the separation pay exemption pursuant to Treasury regulation §1.409A-1(b)(9)(iii) or as short-term deferrals pursuant to Treasury regulation §1.409A-1(b)(4). Each payment and benefit hereunder shall constitute a "separately identified" amount within the meaning of Treasury regulation §1.409A-2(b)(2). Any payment that is deferred compensation subject to Section 409A of the Code which is conditioned upon Employee's execution of a release and which is to be paid during a designated period that begins in one taxable year and ends in a second taxable year shall be paid in the second taxable year. Notwithstanding any other provision in this Agreement, if Employee is a "specified employee," as defined in Section 409A of the Code, as of the date of termination, then to the extent any amount payable under this Agreement (i) constitutes the payment of nonqualified deferred compensation, within the meaning of Section 409A of the Code, (ii) is payable upon Employee's separation from service, within the meaning of Section 409A of the Code, and (iii) would be payable prior to the six-month anniversary of Employee's separation from service, payment of such amount shall be delayed until the earlier to occur of (a) the six-month anniversary of the date of such separation from service or (b) the date of Employee's death. Any amount of expenses eligible for reimbursement, or in-kind benefit provided, during a calendar year shall not affect the amount of expenses eligible for reimbursement, or in-kind benefit to be provided, during any other calendar year. Any reimbursement shall be made no later than the last day of the calendar year following the calendar year in which the expenses to be reimbursed were incurred. The right to any reimbursement or in-kind benefit pursuant to this Agreement shall not be subject to liquidation or exchange for any other benefit.

*[Remainder of page intentionally left blank; signature page follows.]*

DocuSign Envelope ID: FAAD3C2F-4809-4403-A99D-3CE984E4B9AC

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BEACON SALES ACQUISITION, INC.**

DocuSigned by:
Munr Best
By: 2A50EA07C15341C...
Name: C. Munroe Best III
Title: President, South Division

**DARIUS MOURA**

DocuSigned by:
Darius Moura
BA8ECBEDDD6B431